IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-01-98 |
| | § | CIVIL ACTION NO. H-04-365 |
| THOMAS METTEAUER SAUCEDA | § | |
| | § | |
| | § | |
| Defendant-Movant. | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Thomas Metteauer Sauceda's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 80),[1] Movant's Memorandum in Support of § 2255 Motion (Document No. 84), Supplemental Memorandum in Support of § 2255 Motion (Document No. 92), the United States' Second Amended Answer and Second Amended Motion for Summary Judgment (Document Nos. 95 and 96), and Movant's Response to the Government's Motion for Summary Judgment (Document No. 90). After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's

---

[1] Thomas Metteauer Sauceda's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-04-365 and at Document No. 80 in Criminal Action No. H-01-98. References hereafter will be to the Criminal Document numbers unless otherwise indicated.

Second Amended Motion to Expand the Record to Include Affidavit of Counsel (Document No. 96) and the Government's Second Amended Motion for Summary Judgment (Document No. 96) both be GRANTED, that Movant's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document No. 80) and Request for Evidentiary Hearing (Document No 80) both be DENIED and that this § 2255 proceeding be DISMISSED.

## I.    Procedural History

Movant Thomas Metteauer Sauceda ("Sauceda") who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255. This is Sauceda's first attempt at § 2255 relief.

On February 5, 2001, Sauceda was charged in a 25 count Indictment with healthcare fraud and money laundering. (Document No. 1). Sauceda pleaded guilty, pursuant to a written Plea Agreement, to healthcare fraud in violation of 18 U.S.C. § 1347 (count one). Under the written Rule 11(e)(1)(A) and (B) Plea Agreement (Document No. 46), Sauceda pleaded guilty to count one. The Government, in exchange for Sauceda's plea, agreed to dismiss the remaining counts against Sauceda at sentencing. In addition, the Plea Agreement set forth the penalty for the offense to which Sauceda agreed to plead guilty as follows:

> 3. The penalty for each violation of Title 18, United States Code, Section 1347, is a maximum term of imprisonment of 10 years, and a fine of $250,000.00, and a period of supervised release not to exceed 3 years. The defendant acknowledges that he may be required to make full restitution for the loss sustained by the victims of the offenses of conviction. The defendant also acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then the Defendant may be imprisoned for a term of two years without credit for time already served on the term of supervised release prior to such violation. (Document No. 46).

Also, with respect to the calculation of Sauceda's sentence, the Plea Agreement states:

> 2 (f). The defendant understands and agrees that the U.S. Probation Office and the United States District Court have the sole discretion to determine the appropriate sentencing guideline range pursuant to the USSCGM, and that the government's decision to make certain recommendations or to seek specific adjustments based on its interpretation of the facts and the applicable guidelines are not binding on the U.S. Probation Office or the United States District Court.

> \*                    \*                    \*

> 12.  The defendant understands that the sentence to be imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw his guilty plea and will remain bound to fulfill all of the obligations under this agreement.

> 13.  The defendant is aware that the defendant's sentence will be imposed in accordance with the USSCGM. The defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense to which the defendant pleads guilty. The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. **Knowing that, the defendant waives the right to appeal the sentence or the manner in which it was determined on the grounds set forth in Title 18, United States Code, Section 3742 except only that he may appeal any upward departure from the USSCGM not requested by the United States.** This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

> 14.  The defendant is also aware that the United States Constitution and the laws of the United States, including Title 28, United States Code, Section 2255, afford a defendant the right to contest or "collaterally attack" his conviction or sentence after his conviction has become final. **Knowing that, the defendant waives his right to contest or collaterally attack his conviction or sentence by means of any post-conviction proceeding.**

> 15.  In agreeing to waive his right to appeal his sentence or collaterally attack his conviction or sentence, the defendant is aware that a sentence has not yet been determined by the Court. **The defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that the defendant may have received from the defendant' s counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the**

**United States, the Probation Office or the Court.** The United States does <u>not</u> make any promise or representation concerning what sentence the defendant will receive. Realizing the uncertainty in estimating what sentence the defendant will ultimately receive, **in exchange for the concessions made by the United States in this plea agreement, the defendant knowingly waives the right to contest his conviction or sentence by means of a post-conviction proceedings, and he knowingly waives the right to appeal the sentence except to the extent set out above.**

(Document No. 46, pp. 7-8, emphasis in original). Additionally, Sauceda and his counsel, David Adler, as part of the written plea agreement, each stated that Sauceda had been advised about his rights and about the applicable sections of the sentencing guidelines. (Document No. 46, p. 13).

At Sauceda's April 17, 2002, Rearraignment hearing, the Court engaged in an extended colloquy to ensure that Sauceda understood the charges against him, the maximum penalties, the rights he was waiving, including the right to appeal, the factual basis of the plea, and the manner in which his sentence would be calculated. (Document No. 45, Transcript of Rearraignment Hearing, Document No. 83, pp. 8-16). In particular, with respect to Sauceda's understanding of the plea agreement, the maximum penalties, and the calculation of Sauceda's sentence, the following exchanges took place between Sauceda and the Court regarding Sauceda's understanding of the plea agreement and the manner in which his sentence would be calculated:

> The Court: All right. Under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow to determine what the sentence will be in a criminal case. Have you and Mr. Adler talked about how those guidelines might apply in your case?
>
> The Defendant: Yes, ma'am.
>
> The Court: Do you understand that today I do not know what your sentence will be?
>
> The Defendant: I understand.

4

The Court: And that I won't know until after a probation officer has done an investigation of your case and has written a presentence report that will assist me in sentencing? Do you understand?

The Defendant: I understand.

The Court: And you and Mr. Adler will be given a copy of that report and Mr. Calvert will also get a copy of that report and each of you will be given an opportunity to make any objections you may have to the report. Do you understand that?

The Defendant: I understand.

The Court: We will then have a sentencing hearing. And at that hearing, I will rule on any objections that may be made to the report. I will also rule on any motions that may be made, any recommendations that may be made, or any other matters that might come to my attention that would have something to do with the kind of sentence that you receive. Do you understand that?

The Defendant: I understand.

The Court: And at the conclusion of that sentencing hearing, I will then be in a position to determine what your sentence is. Do you understand that?

The Defendant: I understand.

The Court: And it could be that at that point – when I've determined what your sentence will be, it could be that I – that I give you a sentence that's more severe than the one that you and Mr. Adler may have estimated that you might get when you-all were discussing how the guidelines might apply in your case. Do you understand that?

The Defendant: I understand.

The Court: And if the sentence I give you is more severe than the one that you-all estimated that you might get, do you understand that you will not be given a chance to withdraw your plea of guilty?

The Defendant: I understand.

The Court: Do you also understand that under some circumstances after your guideline range has been determined the Court would have the authority to depart from those guidelines and to impose a sentence that is either more severe or less

severe than the sentence called for by the guidelines? Do you understand?

The Defendant: I understand.

*       *       *

The Court: Do you also understand that under some circumstances you or the Government would have the right to appeal any sentence that I impose?

The Defendant: I understand.

The Court: All right. Has Mr. Sauceda waived his right to appeal?

Mr. Adler: There is a waiver contained in the plea agreement.

*       *       *

The Court: All right. Do you understand that – that by entering into this plea of – plea agreement this morning that you will be waiving or giving up most, if not all, of the rights you would have to appeal any sentence that I impose: Do you understand that?

The Defendant: I understand.

The Court: All right. And in any event, any right you do have to appeal would be governed by that written plea agreement.

The Defendant: I understand.

In addition, with respect to the factual basis of Sauceda's plea, the record shows:

The Court: Mr. Calvert, tell me what it is the Government is prepared to prove if we went to trial.

Mr. Calvert: Yes, your Honor. The United States would prove beyond a reasonable doubt that the Defendant, Thomas Metteauer Sauceda, owned and operated Texas Recovering and Addictions Foundation, doing business as Serenity Center. From a period of September, 1996, and then continuing until on or about October, 1998, the Defendant conspired and executed a scheme to defraud the United States and its agency, the Texas Medicaid Program, by making false statements and by submitting false, fraudulent, and fictitious claims for reimbursement to the Medicaid program.

These claims were false and misleading in that the identified adolescent was not chemically dependent and/or the identified adolescent was not recommended by a physician or other licensed practitioner and/or the purported group or individual counseling session never took place or that the counseling sessions were shorter in time than the amount billed to the Medicaid program.

In this specific count, Thomas Metteauer Sauceda submitted claims for a juvenile known as a patient - known as patient 514023342 for chemically dependent counseling alleging services were rendered on May 22 through the 24; May 27, 29 through the 31; and June 2 through the 7, all in 1997, knowing that that specific juvenile was not chemically dependent, that she or he had not been recommended to the clinic or any other – by any licensed practitioner nor were the services rendered as billed. All acts were done with the specific intent of deceiving Medicaid.

The Court: Mr. Sauceda, tell me in your own words what it is you did to commit the crime you're pleading guilty to this morning.

The Defendant: I think that I made errors in connection with the billings and in terms of the kids being chemically dependent, and I don't think it's an excuse for not knowing what I was doing. I should have researched it more and it's ---.

(Document No. 83, Transcript of Rearraignment Hearing, pp. 9-11, 14-16).

Prior to sentencing, a Pre-sentence Investigation Report ("PSR") was prepared (Document No. 56, and Second Addendum to the PSR, Document No. 62), to which Sauceda filed written objections.[2] (Document Nos.52, 53, 54). Pursuant to the PSR, Sauceda's sentence was

---

[2] Sauceda objected to factual findings in the PSR. In particular, Sauceda objected to the 16 level enhancement to his base offense level based on the loss amount calculation. According to Sauceda, the PSR grossly overstated the amount of loss in paragraphs 25 and 32 of the PSR. Sauceda's objection of paragraph 25 states:

8. Page 9, paragraph 25 - Sauceda objects to the PSR's calculation that the intended loss is the amount submitted to Medicaid ($2,225,469) and that the actual loss is the amount paid by Medicaid ($1,466,678). In order for either of these numbers to be correct, a preponderance of the evidence would have to demonstrate that all of the Center's activities were false or fraudulent. This is simply not the case but, more importantly, the evidence does not even address the vast majority of attendees to the Center. The PSR suggests punishing Sauceda

calculated as follows: (1) In calculating Sauceda's base offense level, because Sauceda had been convicted of a violation of 18 U.S.C. § 1347, U.S.S.G. § 2B1.1 directed a base offense level of 6. (2) Because the "intended loss" was $2,225,469, under U.S.S.G. § 2B1.1, Application Note 2(A)(ii), Sauceda's offense level was increased by 16 levels based on this amount of loss. (3) Because Sauceda was an organizer/leader of a criminal scheme described as otherwise extensive and for which he directed at least one additional criminally responsible participant, his offense level was adjusted upward by four levels pursuant to U.S.S.G. § 3B1.1(a). (4) Because Sauceda abused his trust agreement with the Texas Medicaid Program, as contained in the Provider Agreement, which significantly facilitated the offense, pursuant to U.S.S.G. § 3B1.3 his offense

---

based upon wholly unsupported premise that all of the Serenity Center's activities were fraudulent.

Moreover, Application Note 8(d) to U.S.S.G. § 2F1.1 states, "In a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses." The Court must, under this application note, determine the amount of diverted money that *was not* used for actual treatment.

Sauceda requests that the PSR be amended after a determination is made as to which of the Center's billings were improper. Alternatively, Sauceda believes - after reviewing the relevant records - that approximately 200,000 to 300,000 dollars in billings were improper.

9. Page 10, paragraph 32 - Sauceda again objects to the PSR's loss calculations. There is not evidence supporting the contention that the actual or intended loss resulted from fraudulent billings on all 782 children treated at the Center. The PSR's loss calculation does not take into account any of the Center's legitimate activities or expenses such as counselor salaries, rent, etc.

10. Paragraph 42- Sauceda's total offense level should be recalculated with a more accurate representation of the actual or intended loss.

(Document No. 54, pp. 3-4)(emphasis is original).

level was adjusted upward by two levels. (5) Because Sauceda accepted responsibility for his
conduct, and did so in a timely manner, pursuant to U.S.S.G. § 3E1.1(a) & (b), his offense level
was reduced by three levels. (6) With an adjusted base offense level of 25, and with a criminal
history category of I, Sauceda had a guideline sentencing range of 57 to 71 months. (Document
Nos. 52 & 54). Sauceda was sentenced on January 24, 2003. (Document No. 64, Transcript
of Sentencing Hearing, Document No. 78). In connection with Sauceda's sentencing, Judge
Harmon addressed Sauceda's specific objections to the PSR and, in particular, to the calculation
of the amount of loss to Medicaid. With respect to those objections, the record shows that Judge
Harmon considered and rejected Sauceda's objections as follows:

> Mr. Adler: And that relates to the loss calculation that has been identified in the
> PSR as approximately 2.2 million of intended loss or one point – approximately 1.4
> million of actual loss; and the basis – I believe the basis in the PSR for that
> calculation is that all of these – all of the activities that Mr. Sauceda was engaged
> in were fraudulent.
>
> We don't think there's a preponderance of the evidence that supports the finding
> that all of the funds were diverted away from legitimate Medicaid-type programs.
> That's really the substance of the objection.
>
> The Court: And the probation officer's response is that she questioned at length
> the FBI investigative agent who reported that the Defendant fully admitted that
> Serenity Center's services were for at-risk children. This counseling was billed
> fraudulent under LPC numbers for counseling services rendered to these children
> when, in fact, there is no evidence of a chemical dependency or mental health
> diagnosis.
>
> They were - whatever education they may have received by the LPC trainees is not
> a reimbursable expense allowed by Medicaid. As such, each claim submitted is
> deemed fraudulent and the billed amount is correctly identified as the intended loss
> figure.
>
> To me, that's enough to establish by a preponderance of the evidence. So I'm
> going to overrule that objection. (Document No. 78, p. 5-6).

Sauceda was sentenced to a term of imprisonment of 57 months, to be followed by a three year term of supervised release. Also, the Court ordered restitution in the amount of $1,466,678 to Medicaid, and imposed a special assessment of $100. (Document No. 64, Transcript of Sentencing Hearing, Document No. 78, pp. 16-17). In addition, upon motion of the Government, the Court dismissed the remaining counts against Sauceda. (Document No. 65). Judgment was entered on January 30, 2003. (Document No. 66). On January 28, 2004, within one year of his conviction being final, Sauceda timely filed a § 2255 Motion to Vacate, Set Aside, or Correct Sentence. (Document No. 80). Thereafter, Sauceda filed a Memorandum in Support of his § 2255 motion (Document No. 84) and a Supplemental Memorandum of law in Support of § 2255 motion (Document No. 92).

In his § 2255 motion, Sauceda raises numerous claims which relate to length of his prison sentence. According to Sauceda, his counsel rendered ineffective assistance of counsel. In particular, Sauceda claims that counsel failed to conduct a proper investigation of his business records, and had he done so, counsel would have been able to object to the amount of loss claimed by Medicaid, which according to Sauceda was greatly exaggerated in the PSR. In addition, he argues that counsel rendered ineffective assistance during plea negotiations, Rule 11 proceedings, preparation of the PSR, and sentencing hearing. Sauceda further alleges that counsel failed to advise him of the application of relevant conduct and the manner in which his guideline sentencing range would be calculated. Also, Sauceda argues counsel failed to argue that the amount of loss to Medicaid should be limited to the amount set forth in count one ($652.00) of the Indictment, and failed to invoke *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and its progeny, *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. (2004), and *United States v. Booker,* ___ U.S.___ , 125 S.Ct.

738 (2005). According to Sauceda, his guilty plea was unknowing and involuntary because counsel advised him to sign a plea agreement which waived his constitutional rights and right to appeal.

The Government, in response, filed a Second Amended Answer and Motion for Summary Judgment. (Document Nos. 95 and 96). According to the Government, Sauceda's § 2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Sauceda, as part of his written Plea Agreement, knowingly and voluntarily waived his right to collaterally challenge his conviction. The Government further argues that even assuming that Sauceda had not waived his right to collaterally challenge his conviction, his claims are without merit. With respect to Sauceda's ineffectiveness of counsel claims, the Government has submitted an affidavit of Sauceda's counsel, David Adler, in which he responds to Sauceda's allegations. The Government requests that the record be expanded to include counsel's affidavit.

The undersigned Magistrate Judge finds the Government's request for expansion of the record to be well-taken and the affidavit of Mr. Adler shall be included in the record. Mr. Adler states in pertinent part as follows:

> 3. I was appointed to represent Thomas Sauceda in criminal cause number H-01-98 that was filed in the United States District Court for the Southern District of Texas. I was appointed to replace the Federal Public Defenders office after Mr. Sauceda requested a change of appointed counsel.
>
> 4. I thoroughly investigated the evidence against Mr. Sauceda. I reviewed voluminous documents provided by the government, as well as materials provided by Mr. Sauceda. I also reviewed the file of Mr. Sauceda's prior attorney and spoke with his prior attorney about the case.
>
> 5. I met with Mr. Sauceda and his wife on numerous occasions during the course of my representation. I repeatedly discussed the evidence with Mr. Sauceda, and I fully explained to Mr. Sauceda how federal substantive and procedural law

applied to his case. I spent hours explaining to Mr. Sauceda the advantages and disadvantages of going to trial, and of pleading guilty. I repeatedly provided Mr. Sauceda with detailed explanations of the federal sentencing guidelines and how they might affect his ultimate sentence if he was convicted either at trial or by pleading guilty. Mr. Sauceda and his wife asked questions about all aspects of his case and the law, and I answered all of their questions.

6. After reviewing the case, I advised Mr. Sauceda that I believed that the evidence amassed by the government was likely sufficient to obtain a guilty verdict from a jury. I explained that I believed the documentary evidence of fraud was overwhelming, as was the testimony that would likely come from the government's witnesses who would likely include Mr. Sauceda's own son.

7. I explained to Mr. Sauceda that federal law provides for a potentially lower sentence for a defendant who pleads guilty. I further explained that he would have to surrender his constitutional rights if he wanted to plead guilty. Mr. Sauceda again asked questions about this aspect of his case, and I answered all of his questions. I believe Mr. Sauceda fully understood the benefits of pleading guilty, as well as the corresponding risks and the corresponding waiver of his rights. I also explained the advantages and disadvantages of entering into a plea agreement with the government. I explained all provisions and waivers of the proposed plea agreement, and answered all of Mr. Sauceda's questions about the document. At no time did I force or coerce Mr. Sauceda into pleading guilty or into signing the plea agreement.

8. Well before Mr. Sauceda decided to plead guilty, I explained to Mr. Sauceda that federal law in place at the time allowed for him to be sentenced based on findings made by Judge Harmon. One of the possible findings I explained to Mr. Sauceda concerned the concept of relevant conduct. I advised Mr. Sauceda that this body of law meant his sentence could be calculated based on a loss figure higher than what he hoped would be used, or higher than my estimate. Mr. Sauceda appeared to fully understand this concept, as did his wife.

9. I filed objections to the presentence investigation report (PSR) issued by the U.S. Probation Office in Mr. Sauceda's case. Before I filed these objections, I met with Mr. Sauceda and his wife and we reviewed the PSR. Mr. Sauceda and his wife raised questions about portions of the report and I answered these questions. I also advised Mr. Sauceda of the objections I planned to file, and Mr. Sauceda agreed with my intentions. I asked Mr. Sauceda if there are any other objections he had to the PSR, or any mistakes he felt were improperly included in the PSR. Mr. Sauceda stated there were none other than the objections I suggested. (Attachment A to Document Nos. 95, 96).

A defendant's waiver of his statutory right to collaterally challenge his conviction with a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255, like a waiver by a defendant of his right to appeal, is generally enforceable if the waiver is both knowing and voluntary. *United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994) (Enforcing defendant's voluntary and knowing waiver of § 2255); United *States v. McKinney,* 406 F.3d 744 (5th Cir. 2005) (Enforcing, post-*Booker*, a waiver of appeal right that was signed prior to the issuance of *Booker)*. When, however, a defendant alleges that his counsel was ineffective in negotiating a plea agreement, such ineffectiveness claims are not barred by the waiver. *See United States v. White,* 307 F.3d 336, 343 (5th Cir. 2002) (" [i]neffective assistance of counsel argument survives a waiver of appeal only when the claimed assistance directly affected the validity of that waiver or the plea itself."); *United States v. Cockerham,* 237 F.3d 1179, 1187 (10th Cir. 2001), ("[W]e hold that a plea agreement waiver of postconviction rights does not waive the right to bring a § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver. Collateral attacks based on ineffective assistance of counsel claims that are characterized as falling outside that category are waivable."), *cert. denied*, 534 U.S. 1085 (2002); *DeRoo v. United States*, 223 F.3d 919, 924 (8th Cir. 2000) (" A defendant's plea agreement waiver of the right to seek section 2255 post-conviction relief does not waive defendant's right to argue, pursuant to that section, that the decision to enter into the plea was not knowing and voluntary because it was the result of ineffective assistance of counsel."); *Mason v. United States,* 211 F.3d 1065, 1069 (7th Cir. 2000) (where the ineffectiveness claims raised in a § 2255 motion relate to counsel's performance at sentencing, the defendant's plea agreement waiver of this right to challenge his conviction in a § 2255 proceeding is enforceable), *cert. denied*, 531 U.S. 1175

(2001).[3]  Ineffective assistance of counsel claims, including challenges to counsel's performance at sentencing, which do not relate to the validity of the Plea Agreement and waiver can be waived. *White,* 307 F.3d at 343.  Otherwise, "[i]f all ineffective assistance of counsel claims were immune from waiver, any complaint about the process could be brought in a collateral attack by merely challenging the attorney's failure to achieve the desired result.  A knowing and intelligent waiver should not be so easily evaded." *White,* 307 F.3d at 344.

Here, pursuant to a written Plea Agreement, Sauceda waived his right to appeal or collaterally challenge the sentence imposed except under limited circumstances.  As discussed above, the Plea Agreement was explicit with respect to the waiver of the right to appeal and to pursue collateral relief, and the waiver portion of the agreement was bolded and underlined.

In addition, at his Rearraignment on April 17, 2002, the Court engaged in an extended colloquy to ensure that Sauceda was competent to participate in the Rearraignment proceedings, understood the offense to which he was pleading guilty, the maximum sentence he faced, and the rights he was giving up by virtue of his guilty plea. The Court also advised Sauceda that his sentence could not be determined until a presentence investigation had been completed, that

---

[3] There are some other limited situations in which a plea agreement waiver of the right to seek collateral review under § 2255 is not enforceable, such as where the sentence imposed violates the terms of the plea agreement, the sentence is illegal, or the Government has suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). *See DeRoo,* 223 F.3d at 923 ("defendants cannot waive their right to appeal an illegal sentence or a sentence imposed in violation of the terms of an agreement"); *United States v. Baramdyka,* 95 F.3d 840, 843 (9th Cir. 1996) ("the wavier of a right to appeal may be subject to certain exceptions such as claims involving a breach of the plea agreement, racial disparity in sentencing among codefendants or an illegal sentence imposed in excess of a maximum statutory penalty"), *cert. denied,* 520 U.S. 1132 (1997); *United States v. Hollins,* 97 Fed. Appx. 477, 479 (5th Cir. 2004) (Waiver does not preclude review of a sentence that exceeds the statutory maximum). None of those circumstances is at issue in this proceeding.

14

Sauceda could not withdraw his guilty plea if he determined that he did not like the sentence the Court imposed, and that the written Plea Agreement was binding on the parties, but not the Court. (Document No. 83, pp. 3-4, 8-14).

Given Sauceda's statements on the record, which carry a strong presumption of verity, *Blackledge v. Allison,* 431 U.S. 63, 74 (1977), that he had read and discussed the written Plea Agreement with his counsel, that he understood the statutory and constitutional rights which he waived, that he understood his possible range of punishment and how his sentence would be computed, and in particular, that he understood that he had waived his right to appeal and to file a post conviction proceeding, Sauceda has not shown that his plea was not counseled, knowing and voluntary. Sauceda's conclusory assertion that he did not understand what he had waived is belied by this record, and as such, does not suffice to overcome enforcement of the waiver. Because Sauceda's plea agreement, and waiver of appeal and collateral rights contained therein, were knowingly, voluntarily, and intelligently entered, because Sauceda has waived his right to bring a § 2255 motion, and because that waiver is valid and should be enforced, it serves as a bar to the instant § 2255 motion.

Moreover, Sauceda's attempts to overcome the waiver by alleging ineffective assistance of counsel are unavailing because the gist of his claims relate to counsel's conduct *after* the plea was entered and pertain to the calculation of relevant conduct for purposes of calculating his guideline sentence. Sauceda objects to the loss amount incurred by Medicaid as a result of the submission of false/fraudulent counseling claims. According to Sauceda, the amount of loss should have been limited to the amount of loss specified in count one ($652), which would have resulted in a sentencing range of 0 to 6 months.

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id.* at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id.* at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied*, 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland*, 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Thus, Sauceda "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* As to the specific examples of ineffective assistance of counsel which Sauceda cites to in support of his ineffectiveness claims, such as that counsel should have conducted a more thorough investigation into the amount of loss, and objected to the amount of loss used to calculate his relevant conduct, the record either affirmatively shows that Sauceda's

counsel was not deficient or there is no evidence that the alleged errors prejudiced Sauceda within the meaning of *Strickland*.

Here, the record shows that Sauceda's attorney knew of, and discussed with him, his relevant conduct, and filed written objections to the PSR based on his review of the business records. In addition, given Sauceda's participation in counseling activities provided by Texas Recovering and Addiction Foundation that operated the Serenity Center that served as a basis for the healthcare fraud and money laundering charges, alleged to have occurred beginning in September 1996, and continuing through October, 1998, Sauceda was familiar with the claims submitted to Medicaid totaling $2,225,469.00 and those paid, which totaled $1,466,678. Given Sauceda's sworn statements at his Rearraignment hearing, which are entitled to the presumption of truthfulness, Sauceda has not shown that he was unaware that he could be sentenced to more than seven months. The maximum sentence for a violation of count one was 120 months or ten years. Sauceda's sentence of 57 months is well below that maximum sentence. Also, the record shows Sauceda neither challenged the terms of the plea agreement at his rearraignment hearing nor at his sentencing. Sauceda repeatedly acknowledged that he understood that no one could tell him with specificity the length of sentence which would be imposed by the Court and that his sentence would be determined by the Judge *only*. Similarly, the written Plea Agreement stated he could receive a sentence of up to ten years, that his sentence would be imposed in accord with the Sentencing Guidelines, that the Court could impose *any sentence* within the statutory maximum, that the sentence to be imposed was within the discretion of the court, and that imposition of the maximum sentence would not be grounds to withdraw his plea. (Document No. 83). Upon this record, Sauceda was aware when he entered the Plea Agreement and at the time of his

Rearraignment hearing, that his sentence could be up to 120 months or ten years and he fully was aware of the manner in which his sentence would be calculated when he entered his guilty plea.

Also, Sauceda's suggestion that counsel failed to thoroughly investigate his business records and object to the amount of loss is belied by the record. Contrary to Sauceda' s contentions, the record shows that his counsel was familiar with the federal sentencing guidelines, the facts of the instant action, the relevant business records, and had discussed the calculation with Sauceda and his wife. Counsel objected to the calculation of Sauceda's relevant conduct and, in particular, to the loss amount calculation. For instance, counsel argued that not all the activities of Serenity Center were false or fraudulent, that many of the activities were legitimate activities and expenses, and argued, based on his review of the relevant records, a more accurate loss amount would be $200,000 to $300,000. To the extent Sauceda claims that counsel could have objected based on the Plea Agreement and that counsel and the Government breached the Plea Agreement by not objecting to the amount of loss in the PSR, the record belies this contention. The written Plea Agreement did not specify a particular sentence or set a particular amount of loss for purposes of calculating relevant conduct.

Sauceda further claims his counsel was ineffective for failing to object or raise an *Apprendi* claim. With respect to Sauceda's claim that counsel should have raised a claim based on the *Apprendi* decision, and was deficient for failing to do so, Sauceda has made no showing he was prejudiced by counsel's failure. Even had Sauceda raised an *Apprendi* claim, he would not be entitled to relief in light of the United States Supreme Court's decision in *United States v. Cotton*, 535 U.S. 625 (2002) (holding that *Apprendi* error in the indictment is not jurisdictional), which renders Sauceda's *Apprendi* claims meritless because his sentence of 57 months on count one did

not exceed the statutory maximum of 120 months or ten years. See *United States v. Doggett*, 230 F.3d 160, 166 (5th Cir. 2000) (*Apprendi* is "limited to facts which increase the penalty beyond the statutory maximum and does not invalidate a court's factual finding for the purpose of determining the applicable Sentencing Guidelines."), *cert. denied*, 531 U.S. 1177 (2001) (relying on *United States v. Meshack*, 225 F.3d 556, 575-77 (5th Cir. 2000) (*Apprendi* applies only to cases in which a sentence exceeds the statutory maximum and not to cases in which a sentence is enhanced within the statutory range based on a finding of drug quantity), *cert. denied*, 534 U.S. 861 (2001), amended on rehearing on other grounds, 244 F.3d 367 (5th Cir. 2001), *cert. denied*, 534 U.S. 861 (2001); *United States v. Keith*, 230 F.3d 784 (5th Cir. 2000), *cert. denied*, 531 U.S. 1182 (2001). Because Sauceda's sentence of 57 months was well within the statutory maximum of ten years, Sauceda has not specifically articulated how his counsel, through argument, citation to *Apprendi,* or otherwise, could have changed the outcome. As such, this ineffectiveness claim fails.

Lastly, Sauceda argues that the district court's sentencing determination is contrary to the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296, 524 S. Ct. 2531 (2004) and *United States v. Booker,* ___U.S. ___, 125 S.Ct. 738 (2005) because the Court, and not a jury, enhanced his sentence. In *Blakely*, the Supreme Court invalidated the State of Washington's sentencing scheme, whereby a judge could possibly sentence a defendant to a punishment beyond a statutory range on the basis of judicially determined facts. *Id.* at 2538. In doing so, the Supreme Court applied the rule in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Supreme Court in *Blakely* expressly declined to state whether its

decision applied to the Federal Sentencing Guidelines. *Id.*

The Supreme Court, in its intervening decision, *United States v. Booker,* __U.S.__, 125 S.Ct. 738 (2005), extended its holding in *Blakely* to the Federal Sentencing Guidelines, and concluded that there was "no distinction of constitutional significance between the Federal Sentencing Guidelines" and the state sentencing scheme at issue in *Blakely* and, in keeping with its earlier decision in *Apprendi*, stated: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.*, 125 S.Ct. at 756. To remedy the guidelines' Sixth Amendment problem, the Supreme Court severed and excised 18 U.S.C. § 3553(b)(1), which required mandatory application of the guidelines. *Id.* at 756-57, 765. As a consequence, the guidelines are now advisory in all cases. *Id.* at 757. Because *Blakely* and *Booker* were decided after Sauceda's conviction in the instant case became final, it must be determined as an initial matter whether *Blakely/Booker* should be retrospectively applied. The Supreme Court has not stated whether the rule announced in *Blakely* and *Booker* apples retroactively to cases on collateral review. Neither has the Fifth Circuit yet addressed this issue as to initial § 2255 motions. However, the Fifth Circuit has concluded that *Booker* does not apply retroactively on collateral review for purposes of a successive § 2255 motion, *see In re Elwood,* 408 F.3d 211 (5th Cir. 2005) and for purposes the savings clause under § 2255. *Padilla v. United States,* 416 F.3d. 424 (5th Cir. 2005).

New constitutional rules of criminal procedure are applicable to cases on direct review, *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), but are generally not applicable to cases on collateral review. *Teague v. Lane*, 489 U.S. 288, 305-310 (1989). That is because, in the context

of collateral review, "[a]pplication of constitutional rules not in existence at the time a conviction [becomes] final seriously undermine the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." *Teague*, 489 U.S. at 309.

When the Supreme Court announces a "new rule" as it expressly stated it was doing in *Booker*, "the new rule applies to all criminal cases still pending on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 2522-2523 (2004). However, when a conviction is final, such as in Sauceda's case, the "new rule" does not automatically apply. Rather, the three step process announced by the Supreme Court in *Teague* is employed to determine whether a new constitutional rule of criminal procedure is to be applied retrospectively to cases on collateral review. *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 2510 (2004); *O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969 (1997).

*Teague* requires a three step analysis. First, it must be determined when the petitioner's conviction became final. *Beard*, 124 S.Ct. at 2510. Second, if the conviction became final prior to the decision the petitioner seeks benefit of, the court must determine whether the decision relied upon by the petitioner sets forth a "new" constitutional rule of criminal procedure. *See Beard*, 124 S.Ct. at 2510. According to the Supreme Court, a "new" rule is a rule that "breaks new ground" or "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301. Third, if the rule to be applied is "new", the court then considers whether one of the two narrow exceptions to *Teague* applies: (1) where the rule "places 'certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe'" *Teague*, 489 U.S. at 311 (quoting *Mackey v. United*

*States,* 401 U.S. 667, 692 (1971)), and 2) where the new rule is a watershed rule of criminal procedure which is implicit in the concept of ordered liberty and which affects "the fundamental fairness and accuracy of the criminal proceeding." *O'Dell,* 521 U.S. 151, 157 (1997) (quoting *Graham v. Collins,* 506 U.S. 461, 478 (1993)).

Applying the three step process to this case, the undersigned Magistrate Judge concludes that *Teague* bars application of the new rule set forth in *Blakely/ Booker.* First, Sauceda's conviction became final in February 2003, prior to the United States Supreme Court decisions in *Blakely* on January 24, 2004, and *Booker* on January 12, 2005.

Second, the *Blakely/Booker* decisions set forth a "new" constitutional rule of criminal law. According to *Teague,* "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conduct became final." *Teague,* 489 U.S. at 301. As such,

> We must therefore assay the legal landscape as of [February 2003] and ask "whether the rule later announced in [Blakely] and [Booker] was *dictated* by then-existing precedent – whether, that is, the unlawfulness of [Sauceda's] conviction was apparent to all reasonable jurists."

*Beard,* 124 S.Ct at 2511 (quoting *Lambrix v. Singletary,* 520 U.S. 518, 527-28 (1997)). Here, at the time of Sauceda's sentencing, the case law as it existed would not have directed a finding that Sauceda's sentence under the Federal Sentencing Guidelines violated the Sixth Amendment's right to a jury trial. Moreover, it is undisputed that *Blakely/ Booker* advanced a new understanding of "statutory maximum" for purposes of imposing sentence: "[T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely,* 124 S.Ct. at

23

2537 (emphasis in original). Before *Blakely*, every federal circuit court of appeals had concluded that *Apprendi* did not invalidate the Sentencing Guidelines or sentencing enhancements based on judicial fact findings so long as the sentence imposed was within the statutory maximum as determined by the United States Code. *See e.g., United States v.Goodine,* 326 F.3d 26 (1st Cir. 2003), *cert. denied,* 541 U.S. 902 (2004); *United States v. Luciano,* 311 F.3d 146 (2nd Cir. 2002), *cert. denied,* 540 U.S. 1167 (2004); *United States v. DeSumma,* 272 F.3d 176 (3rd Cir. 2001), *cert. denied,* 535 U.S. 1028 (2002); *United States v. Kinter,* 235 F.3d 192 (4th Cir. 2000), *cert. denied,* 532 U.S. 937 (2001); *United States v. Randle,* 304 F.3d 373 (5th Cir. 2002), *cert. denied,* 538 U.S. 962 (2003); *United States v. Helton,* 349 F.3d 295 (6th Cir. 2003); *United States v. Johnson,* 335 F.3d 589 (7th Cir.), *cert. denied,* 540 U.S. 1011 (2003); *United States v. Piggie,* 316 F.3d 789 (8th Cir.), *cert. denied,* 540 U.S. 857 (2003); *United States v. Toliver,* 351 F.3d 423 (9th Cir. 2003), *cert. denied,* 541 U.S. 1079 (2004); *United States v. Mendez-Zamora,* 296 F.3d 1013 (10th Cir.), *cert. denied,* 537 U.S. 1063 (2002); *United States v. Sanchez,* 269 F.3d 1250 (11th Cir. 2001), *cert. denied,* 535 U.S. 942 (2002); *United States v. Fields,* 251 F.3d 1041 (D.C.Cir. 2001), *cert. denied,* 540 U.S. 960 (2003). *Blakely* and *Booker,* in contrast, made clear that the statutory maximum "is  the maximum sentence a judge may impose *solely on the basis of facts reflected in the jury verdict or admitted by the defendant,"* *Blakely,* 124 S.Ct. at 2537 (emphasis in original).[4] As such, the rule in *Blakely/ Booker* that Sauceda would have this Court apply was not dictated or compelled by *Apprendi* and its progeny, and is a "new  rule" of the type

---

[4] Indeed, with respect to the unexpected consequence of *Blakely*, Justice O'Connor in her dissent noted: "there is no map of the uncharted territory blazed by today's unprecedented holding." *Blakely,* ___ U.S. at ___, 124 S.Ct. at 2547 n.1.

barred from retroactive application by *Teague*.

Third, *Blakely/Booker* does not fit into one of the two narrow exceptions set forth in *Teague*. The first exception to *Teague* applies to a new rule that "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague*, 489 U.S. at 307 (quotation omitted). Because *Blakely/Booker* concerns the manner in which a defendant's sentence is determined, the new rule announced in *Blakely/ Booker* is not implicated by *Teague*'s first exception.

With respect to *Teague*'s second exception, the Supreme Court in *Beard* wrote:

> The second exception is for watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. We have repeatedly emphasized the limited scope of the second *Teague* exception, explaining that it is clearly meant to apply only to a small core of rules requiring observance of those procedures that ... are implicit in the concept of ordered liberty. And, because any qualifying rule would be so central to an accurate determination of innocence or guilt [that it is] unlikely that many such components of basic due process have yet to emerge, it should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception.

*Beard*, 124 S.Ct. at 2513-14 (internal quotations and citations omitted). Given that the Supreme Court has previously held that a change in the law requiring that juries, rather than judges, make the factual findings on which a sentence is based did not rise to the level of implicating fundamental fairness and as such did not announce a watershed rule of criminal procedure, *see Schriro*, 124 S.Ct. at 2524-26,[5] and given that the Supreme Court has never held that a new

---

[5] *Schriro* concerned the allocation of fact finding responsibility between the judge and the jury and held that the decision in *Ring v. Arizona,* 536 U.S. 584 (2002), which invalidated judicial fact finding in death penalty cases under the rule announced in *Apprendi*, was a procedural rule not retroactive on collateral review. Because the Arizona statute at issue in *Schriro* required proof beyond a reasonable doubt, the Supreme Court did not address the

criminal procedural rule falls into the second *Teague* exception, there is no basis upon which to retroactive application of *Apprendi*'s holding that sentencing facts necessary to increase a maximum statutory sentence be found beyond a reasonable doubt rather than by a preponderance of the evidence. *See Summerlin*, 124 S.Ct. at 2522 n. 1.

With respect to the burden of proof for sentencing facts, the new procedures required by *Blakely/Booker* do not "implicat[e] the fundamental fairness and accuracy" of criminal proceedings. *Schriro*, 124 S.Ct. at 2523. For example, the maximum term of imprisonment for a sentence is set by the United States Code. With respect to judicial fact-finding, the Court relies on a presentence report, and the defendant is given an opportunity to object to the facts contained in the presentence report. In addition, even though after *Booker* the Guidelines are no longer mandatory, *Booker* states that the Guidelines should still taken into consideration by the Judge imposing sentence, and that the preponderance of the evidence standard applies. *See U.S.S.G. § 6A2.3, Comment.* ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

With respect to sentencing in light of *Booker*, the Fifth Circuit Court of Appeals in *United States v. Mares*, 402 F.3d. 511, 519 (5th Cir. 2005), *pet. cert. filed*, (Mar. 31, 2005) (No. 04-9517) elaborated upon the procedures to be followed at sentencing post *Booker*. According to the Fifth Circuit, "a sentencing court must still carefully consider the detailed statutory scheme created by the [Sentencing Reform Act] and the Guidelines, which are designed to guide the judge toward a fair sentence while avoiding serious sentence disparity." As such, the "[t]he guideline range should be determined in the same manner as before *Booker/Fanfan*" and "*Booker* contemplates, that with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing." According to the Fifth Circuit: "[i]f the sentencing judge exercises her discretion to impose a sentence within a properly calculated Guideline range, in our reasonableness review we will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines. Given the deference due the sentencing judge's discretion under the *Booker/Fanfan* regime, it will be rare for a reviewing court to say such a sentence is 'unreasonable.'"

In the context of a § 2255 motion, because *Booker* instructs courts to consider the Guideline sentencing ranges based on a preponderance of the evidence standard, it cannot be said that sentences calculated in that manner necessarily "implicate[] the fundamental fairness and accuracy of the criminal proceeding." *Schriro*, 124 S.Ct. at 2523. Here, Sauceda's guideline sentencing range was enhanced only after a finding by a preponderance of the evidence by the Court of the sentencing factors, which increased his base offense level based on factors such as relevant conduct and his role in the offense. Sauceda was given the opportunity to challenge these facts, which he did, and post-*Booker*, Judge Harmon would have considered the same facts in imposing sentence under the advisory guidelines. The Court is free to rely on the information contained in the PSR unless the defendant establishes that the information was materially untrue. *United States v. Vela*, 927 F.2d 197, 201 (5th Cir.), *cert. denied*, 502 U.S. 875 (1991). It is pure conjecture and speculation that Sauceda's sentence would have been calculated differently under the advisory guidelines, than was actually found by Judge Harmon by a preponderance of the evidence under the mandatory guidelines.

conclude that *Blakely/ Booker*'s new rule falls within the second exception to *Teague*, and indeed, all the circuits to have considered retroactivity, have concluded that *Blakely/Booker* do not apply retroactively. *See, e.g., United States v. Cruz*, ___F.3d ___, (No. 03-35873), 2005 WL 2243119, (9th Cir. Sep. 16, 2005); *Schardt v. Payne*, 414 F.3d 1025 (9th Cir. 2005); *In re Anderson,* 396 F.3d 1336, 1339 ( 11th Cir. 2005); *McReynolds v. United States,* 397 F.3d 479, 480-81 (7th Cir. 2005), *cert. denied,* 125 S.Ct. 2559 (2005); *Humphress v. United States*, 398 F.3d 855, 862-63 (6th Cir. 2005), *petition for cert. filed,* (May 17, 2005)(No. 05-5130)*; Varela v. United States*, 400 F.3d. 864, 868 (11th Cir. 2005)*, petition for cert. filed,* (June 30, 2005)(No. 05-6041, *United States v. Price*, 400 F.3d. 844, 845 (10th Cir. 2005), *petition for cert. filed*, (May 31, 2005) (No. 04-10694); *Guzman v. United States*, 404 F.3d. 139 (2nd Cir. 2005), *petition for cert. filed*, (July 5, 2005) (No. 05-5187); *Lloyd v. United States,* 407 F.3d 608 (3rd Cir. 2005), *petition for cert filed*, (Aug. 5, 2005) (No. 05-5769; *Cirilo-Munoz v. United States*, 404 F.3d 527, 533 (1st Cir. 2005).

Because *Teague* bars the retrospective application of *Blakely/Booker* in collateral § 2255 proceedings, Sauceda is not entitled to relief under *Blakely/Booker*. In addition, because Sauceda's § 2255 motion should be dismissed, his request for an evidentiary hearing is DENIED.

**V. Conclusion and Recommendation**

Based on the foregoing, it is

RECOMMENDED that that the Government's Second Amended Motion for Summary

Judgment (Document No. 96) be GRANTED, and that Movant Thomas Metteauer Sauceda's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 80) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 6th day of *October*, 2005.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE